**IN THE UNITED STATES OF AMERICA**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **1:14-CR-227** |
| | ) | **1:14-CR-229** |
| | ) | |
| **GARY SHARP, JR.** | ) | |
| | ) | |

**DEFENDANT GARY SHARP'S POST-HEARING BRIEF ON**
**MOTION TO SUPPRESS EVIDENCE**

FACTS

On August 21, 2012 law enforcement agents executed a search warrant on Gary Sharp, Jr's (the defendant, referred to as "Gary" or "Sharp" hereafter) parents' home at 5 Old Summit Road, Coventry, Rhode Island. Transcript of Suppression Hearing ("Tr."), Docket Entry 60 at pp. 5-6. Agents expected to find Gary Sharp, Jr. at that location but discovered he had moved out some months previously. Tr. 7. When agents left his parents' home, they went to 129 Quaker Highway, Apartment 3 in Uxbridge, Massachusetts. Tr. 8. At least 4 agents initially showed up at the apartment and they were later joined by more. Tr. 45.

Katherine Sharp (at that time her last name was Renehan) answered the door. Tr. 9. She was expecting the agents because Gary Sharp's father had called her to tell her that agents had searched his home and were looking for Gary. Tr. 102. Gary was not at home; he was at work at Radio Shack. Tr. 103. Katherine called him and told him he "had to" come home because he needed to "turn himself in." Tr. 103, 116-117. She got this understanding based on her conversation with Gary's father. While she was on the phone with Gary she passed the phone to Agent Kabrhel who then spoke to Gary. Tr. 104-105. Kabrhel didn't tell Gary that he didn't have to come back home if he didn't want to and didn't tell Gary that he didn't have to answer his questions if he didn't want to. Tr. 43. The agents asked if they could come inside the apartment and wait for Gary to arrive back at the apartment. Tr. 113. Once inside, they conducted a search of the apartment to make sure it was clear it for weapons or other people. Tr. 105.

When Gary arrived home he was interviewed by Agents Kabrhel and Ceiplak. At this time they did not tell him that he could stop the questioning at any time if he wanted to. Tr. 48. They questioned him for more than an hour about his involvement with Snappzmarket and Applanet. Tr. 48. Sharp wanted to conduct the interview in the living room with Katherine present but the agents directed him to a back room. Tr. 74. He was separated from Katherine and she was interviewed by different agents. During the interview Kabrhel and Ceiplak (but primarily Kabrhel) asked Gary for his laptop. He declined to give them the laptop several times but the agents were persistent. They told him that if he didn't give them the laptop they would go get a search warrant for it. Tr. 120-124; Gov't Exh. 8. They also asked for his consent to access his email accounts and dropbox folder. He didn't want to give permission for these accounts either but again was told the alternative was for the agents to just get a search warrant. Sharp's impression was that the agents would not leave his apartment until he gave them the laptop. *Id.*

Almost as soon as the agents left his apartment Sharp started to figure out how he could retract his consent. He contacted the Electronic Frontier Foundation and was eventually put in touch with attorney Robert Goldstein and later undersigned counsel. Tr. 132. He exchanged emails with Goldstein and those emails corroborate the pressure Sharp felt to acquiesce to the agents because of their threats to obtain a search warrant. On August 25, 2012 – just four days after the agents interviewed him, Sharp emailed Goldstein and said:

> Afterwards they asked for the laptop in the house. I told them I didn't want to give them it. They then told me that if I didn't want to give them that then they wanted access to my email account and facebook. I told them I didn't want to give them that either. *They then threatened me saying that they could just wait for a warrant to be signed and then they could just take it. They said that for as long as it takes for that warrant to be signed that my house would be there [sic] house and I would have to stay there with them.* [redacted] Afterwards they had me so torn up about what happened and then had me give them my emails accounts [still] *threatening that I would have to stay there with them til a judge signed a warrant.* I still didn't want to give them my personal account but now all of them were just waiting for me to fill out this paper. Nervously I just did what they asked and filled it out. They told

me if I did I wouldn't have to give them the laptop in the house. After I filled it out they said we still need the laptop. They then kept saying all these things to me that if I gave it to them I'd get it back by Friday and *that it's better I just hand it over than them waiting there with me for a warrant to be signed and just taking it.* I was in such a panic and emotional that I then gave them the laptop. I wanted to sign distressed but I was scared of what will happen if I did.

Gov't Exh. 8, emphasis added. On August 27, 2012, sometime before 4:36 pm EST, Attorney Goldstein told AUSA Brian Pearce that Sharp had revoked his consent. At 4:36 pm EST Pearce sent an email to Goldstein saying "I'm on the line with the case agent now and have told him to stop all searches on the three accounts due to revocation you just communicated." Government Exhibit 1. There is no clear evidence as to how broad that revocation was (whether it included the laptop and email and dropbox accounts), but in any event by September 11, 2014 at 3:44 pm consent to search the laptop had clearly been revoked because Don Samuel emailed Pearce to tell him that Sharp withdrew any consent he had given the government to search or seize any computer or other property that was seized from him. *Id.*

## ARGUMENT

This brief addresses three questions. The first question is whether Sharp's consent to search and seize his laptop, email accounts and dropbox accounts was voluntarily given or whether it coerced by the agents' statements that they wouldn't leave his house until they had the laptop, either through consent or a search warrant. If this Court finds his consent was coerced then any evidence from those items is suppressed. If the Court finds his consent was voluntary, then the inquiry moves on to whether any search of the laptop, email accounts and dropbox accounts after Sharp's consent was revoked and before a search warrant was issued was illegal. And finally, whether the search warrant for the laptop included knowing misrepresentations and material omissions about the revocation of Sharp's consent to search and seize his laptop computer.

1.   Sharp's Consent was Coerced

"[W]here the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority." *United States v. Tovar-Rico*, 61 F.3d 1529, 1536 (11th Cir. 1995) *citing to Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983). In the *Tovar-Rico* case the defendant was confronted by at least five police officers knocking loudly at her door, who identified themselves and then requested permission to enter. She opened the door and the officers entered quickly with guns drawn to do the protective sweep. She sat at her dining room table during the sweep and appeared calm. After the sweep was complete, an officer asked her for permission to search the apartment again; he told her she did not have to give her permission but if she did not the agents would come back with a search warrant. She acquiesced and signed a written consent form. The 11th Circuit agreed with the magistrate judge that her consent was involuntary. *Id* at 1535-36. *See also United States v. Vazquez,* 724 F.3d 15 (1st Cir. 2013)(the police told the defendant that they would search her house with or without her consent – they claimed to have the authority based on the fact that her boyfriend was on parole and subject to a warrantless search. She consented but the court ruled her consent was not valid because it was only acquiescence to a show of authority); *United States v. Hicks,* 539 F.3d 566 (7th Cir. 2008)(police may not make baseless threats they will get a search warrant if an occupant of the house does not consent.) And indeed the agent in this case admitted that if consent to search is obtained by threats to get a search warrant that consent will be invalid. Tr. 50-51.

Just like the defendants in *Tovar-Rico* and *Vazquez supra* Sharp's consent was not voluntarily given, rather it was coerced by the agents' pressure to give in and threats to obtain a search warrant if he did not. His day started with being told that he "had to" come home to speak with agents. Then after being separated from his fiancé and interviewed by two agents for more than an hour he was told they wouldn't leave his house without his laptop. In his email to Rob Goldstein he recounted that agents told him they would stay at his house for as long as it took to get a warrant. Gov't Exh. 8, page 6. He denied their requests for his laptop and email accounts several times before

4

finally giving in. And as soon as the agents left he started the ball rolling to revoke his consent by contacting a lawyer.

This Court should find that Sharp's consent was coerced because his testimony at the hearing, and his actions immediately after the agents took his laptop, demonstrate that he was only acquiescing to a show of lawful authority and not voluntarily giving his consent to seize and search his property. Any evidence seized from the laptop, email accounts or dropbox accounts should be suppressed as well as any fruits of that illegal search.

2. <u>Any search of Sharp's laptop or email accounts after consent was revoked was non-consensual and illegal</u>

A person's property can only be legally searched a few ways, including with a warrant or by consent. Given the facts in this case, Sharp's laptop could only have been searched with a warrant or with his consent. When the agents searched the image of his laptop computer in October of 2012 they had neither; the search was illegal and the results should be suppressed.

It appears that agents imaged Sharp's laptop and downloaded his email accounts after August 21st and before his consent was revoked; but that they didn't actually search the forensic image of the laptop or the email accounts prior to the consent being revoked. On August 27, 2012 Rob Goldstein communicated Sharp's revocation of his consent to AUSA Brian Pearce, which Pearce acknowledged in an emailing – stating he had told agents to stop all searches on the "three accounts." Gov't Exhibit. 1. Any information agents learned by searching the three accounts, even if they were only searching a copy of the information in the three accounts, was a non-consensual, illegal search. Any information agents learned after 4:36 pm Est on August 27, 2012 should be suppressed.

The creation of the forensic image of the laptop was started on September 10, 2012. It wasn't finished until approximately 8:45 am EST on September 11, 2012. Exh. C, page USAO-000441 to Docket Entry 54, Sharp's initial motion to suppress. Later that

same day, at 3:44 pm EST Don Samuel informed AUSA Pearce that Sharp withdrew any consent he had given for any computer or any property. So by this time, if the first revocation from Sharp through Attorney Goldstein wasn't clear enough, Sharp explicitly revoked all consent previously granted by him. Gov't Exh. 1, page USAO-000825.  Yet, on October 4, 2012, agents searched the forensic image of Sharp's laptop computer. D.E. 54, Exh. C, USAO-000441. This search was non-consensual and illegal. It was before the search warrant for the laptop was issued (November, 2012). Any information learned from the search of the laptop computer prior to the issue of the search warrant should be suppressed.

Apparently no warrant was ever obtained for Sharp's email accounts or dropbox accounts. Any evidence seized from these accounts after Sharp's consent was explicitly revoked should be suppressed.

3. <u>The Affidavit Failed to Mention Sharp's Revocation of His Consent to Search and Thus Contains Knowing Misrepresentations and Material Omissions.</u>

The search warrant affidavit for Sharp's laptop specifically mentions information learned by the agents through their search of the image of the laptop during the period where Sharp's consent had been revoked and before the search warrant had issued. See Exh. C to D.E. 54 on page USAO-000441, paragraphs 28-33. This issue is a blend of the fruit of the poisonous tree and a *Franks* issue. The warrant relies on illegally obtained information (pre-warrant search of the laptop) which is fruit of the poisonous tree; and it contains material omissions and knowing misrepresentations in that it fails to accurately state that Sharp withdrew his consent before agents searched the forensic image. The affidavit cites the process and timing of the agents imaging of Sharp's laptop, then sets forth the information learned in October of 2012 through a search of the forensic image; then in paragraph 33 the affidavit says "Sharp subsequently withdrew his consent to search the COMPUTER."

First, the affidavit should have stated that Sharp withdrew his consent on September 11, 2012. Second, the way the information in the affidavit is ordered the reader's inference would be that Sharp withdrew his consent *subsequent* to the agents'

search of the forensic image in October. The Government knew the date that Sharp clearly revoked his consent, and the Government knew his consent was revoked well before agents searched the forensic image in October of 2012. Thus, paragraph 33 contains a <u>knowing</u> misrepresentation and a <u>material</u> omission. The paragraph should have stated that Sharp withdrew his consent on September 11, 2012.

If the defendant shows that there are misrepresentations in a search warrant affidavit then the court must decide whether, not including the false information (and including any omitted favorable information), there was still probable cause to search the location. *United States v. Cross*, 928 F.2d 1030 (11th Cir. 1991); *United States v. Weber*, 808 F.2d 1422 (11th Cir. 1987); *United States v. Kirk,* 781 F.2d 1498 (11th Cir. 1986); *United States v. Kapordelis*, 569 F.3d 1291, 1308–1310 (11th Cir. 2009); *United States v. Gamory*, 635 F.3d 480 (11th Cir. 2011). If the illegally obtained information is excluded from the warrant and the warrant is corrected to say that Sharp withdrew his consent to search the laptop on September 11, 2012, what is left fails to establish probable cause because the affidavit doesn't describe a nexus between the laptop and the suspected crimes.

Probable cause to search a place exists when there is a fair probability that contraband or evidence of a crime will be found in a particular place. *Illinois v. Gates*, 462 U.S. 213 (1983); *United States v. Kapordelis*, 569 F.3d 1291, 1310–1312 (11th Cir. 2009); *United States v. Tate*, 586 F.3d 936, 942–943 (11th Cir. 2009); *United States v. Jiminez*, 224 F.3d 1243 (11th Cir. 2000); *United States v. Martin*, 297 F.3d 1308 (11th Cir. 2002) (the affidavit should establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity). Without the information in the affidavit about the information found on the forensic image of Sharp's laptop, there is no reason to believe that evidence of a crime will be found on that laptop; which is presumably why the affiant included that information in the search warrant application.

## CONCLUSION

In summary, this Court should suppress any information from Sharp's laptop, email accounts or dropbox accounts because his consent to search that property was

coerced and not voluntary.  Alternatively, the Court should suppress any evidence seized from those items during the period after his consent had been explicitly revoked and before any search warrant issued. Finally, the Court should find that the search warrant affidavit for the laptop computer contained knowing misrepresentations and material omissions and suppress any evidence seized pursuant to that search warrant.

Respectfully submitted, this 30th day of March, 2015.

GARLAND, SAMUEL, & LOEB, P.C.
*s/Amanda R. Clark Palmer*
Amanda R. Clark Palmer
Ga Bar No. 130608
Attorney for Defendant Sharp

3151 Maple Drive
Atlanta, GA 30305
(404) 262-2225
Fax: (404) 365-5041
aclark@gsllaw.com

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing *Defendant Sharp's Post-Hearing Brief on Motion to Suppress* via the Court's CM/ECF system which will automatically send notice of such filing to all attorneys of record.

This 30th day of March, 2015.

> GARLAND, SAMUEL, & LOEB, P.C.
> *s/Amanda R. Clark Palmer*
> Amanda R. Clark Palmer
> Ga Bar No. 130608
> Attorney for Defendant Sharp